## W. W. Holloway v. The State.

No. 2849.   Decided November 18, 1903.

**1.—Manslaughter—Evidence—Declarations of Defendant.**

Upon a trial for murder, one M. testified that on the evening of the homicide, and shortly before it occurred, appellant stated to him in the store that "no man could beat him out of fifty dollars and live; that he would kill him before he got home." Objection was urged to this testimony because no names were mentioned in connection with said statement; that same did not relate to deceased, and that same was irrelevant and immaterial. Other testimony tended to show that he alluded to deceased when the remark was made, one witness testifying that he made the same remark to him concerning a settlement with deceased. Held, from an examination of the record, the remarks referred distinctly to deceased, and the court did not err in admitting the same.

**2.—Same—Circumstantial Evidence—Eyewitnesses—Bill of Exceptions.**

Where, on a trial for murder, after the State had rested the case on purely circumstantial evidence, the appellant requested the court to require the State to put an eyewitness on the stand, insisting that where there was an eyewitness the State was required to place him on the stand. Held, the bill of exceptions showing that appellant had confessed to the act of killing, the same became positive evidence, and in view of the fact that the eyewitness was a brother-in-law of defendant, was unfriendly to the State, and was so drunk at the time as to know nothing about the facts in the case, there was no error.

**3.—Same—Former Decision Questioned.**

The doctrine of requiring the State to put an eyewitness on the stand, announced in the case of Thompson v. State, 30 Texas Crim. App., 325, was discussed in McCandless v. State, 42 Texas Crim. Rep., 655, where it was seriously questioned.

**4.—Character of Defendant—General Reputation—Proof of.**

Where defendant put his character in issue as being that of "a good, quiet, peaceable and law abiding citizen," and the State was permitted to prove on cross-examination that the witness had heard that defendant had been sent to the penitentiary for cattle theft, and that fact, together with the reputation of defendant, had been discussed in the neighborhood where witness and defendant lived. This was objected to on the ground that same was immaterial and irrelevant to any issue. Held, while not competent for the State originally to put defendant's reputation in issue, still, defendant having himself done so, it was proper, on cross-examination of his witnesses, to prove particular acts of misconduct, or, where the proof was of general reputation, that the witness had heard of particular acts of misconduct.

**5.—Charge of Court—Temporary Insanity.**

Where there was evidence tending to show that appellant was under the influence of liquor at the time of the commission of the homicide, Held, no error in charging on temporary insanity caused by the recent use of ardent spirits.

**6.—Same—Weight of Evidence.**

Where the court charged the jury, "The evidence before you relative to defendant having served a term in the penitentiary can only be considered

by you as affecting defendant's reputation as a good citizen, and you will consider same for no other purpose," and it appearing from the record that this testimony was not introduced for this purpose, but was merely the cross-examination of defendant's witnesses as to his character, placed in issue by himself, Held, error for the court to so submit defendant's character as a good citizen, and was a charge on the weight of evidence as calling their attention directly to defendant's character without telling them for what purpose his character could be considered.

Appeal from the District Court of Falls. Tried below before Hon. Sam R. Scott.

Appeal from a conviction of manslaughter; penalty, three years imprisonment in the penitentiary.

Appellant was tried in the District Court of Falls County upon indictment filed January 22, 1903, charging him with the murder of one Robert Goolsby, by shooting him with a pistol. Upon this trial he was convicted of manslaughter, the verdict being for three years imprisonment, upon which judgment was rendered and from which defendant appealed to this court.

The evidence shows that the killing occurred in a wagon on the public road, upon a sudden quarrel arising from acts of deceased in the wagon towards appellant, but was probably aggravated by bad feeling arising from a cotton settlement had between them that day in town; and in which settlement appellant claimed that Goolsby (deceased) had beaten him out of fifty dollars. Both had been drinking to some considerable extent, if they were not drunk. Goolsby (deceased) appeared to be too drunk to get out of the wagon before they left the store in the town of Rosebud.

As to the facts which probably led up to the killing the witness Charley Myers testified for the State: "I live at Rosebud; am in the mercantile business. Know defendant, and knew deceased. Saw these parties on the 23d day of September of last year at my store. They came in the morning and brought with them a bale of seed cotton. They came into the store between 8 and 11 o'clock in the morning, and made a trade and wanted me to draw it up for them, which I did. Then they went out and sold the cotton and came back and had a settlement; it was agreeable to both sides I suppose. They both so stated. They had just come to town, as I understood it, at the time they first came into the store. Defendant was not drinking at the time. Saw them between 1 and 2 o'clock. He had bought some goods from me, and at that time he came into the store for them; his wagon was at the back end of the house. He said that no man could beat him out of anything; that if he would not pay him he would kill him before he got home. He said the amount was $50. He said no man could beat him out of $50 and live, that he would kill him before he got home. At that time Goolsby (the deceased) was in the wagon at the back of the house. I went out to help put the things in the wagon, and Goolsby told defendant to get in the wagon and go home, and defendant said all right, as soon as he got ready he would go. Defendant was putting a sack of flour in the wagon and he threw the flour

in rather roughly, and Goolsby told him not to break it, that he, defendant, had paid for it, and defendant replied, "Yes, it did not cost you anything." Defendant was cursing all the time. Then the three went off together. The other man was Mr. Harding. I think he is a brother-in-law of defendant. They were all three pretty full I suppose Goolsby was about the drunkest. He could not get out of the wagon. He was the drunkest of the three. Holloway was drinking, and so was Harding." On cross-examination, he testified: "They didn't any of them seem to be mad; they seemed pleasant. They were not cursing each other. Just cursing; none of them used any names, but of course they were using oaths. Didn't hear Harding use any oaths; I am sure of that. At the time he said that no man could beat him out of $50 and live, he didn't say that Goolsby had beaten him out of anything, and didn't call any name; he just made that remark. Defendant was cursing in the back of the store, and Goolsby was in the wagon cursing, and trying to get out, and Harding would not let him. I don't know who Goolsby was cursing, he was just drunk. He didn't say anything about what a good man he was, but he was talking about fighting; and said, with an oath, that he could whip any kind of a man. All three of them said that they could whip the town if I would turn them loose. Defendant was not laughing when he said no man could beat him out of $50 and live. This remark was made in the house and Goolsby was in the wagon. It seemed that he was so drunk that he could not get out of the wagon."

Frank Dunklin testified: "I know defendant. Some time in September of last year I had a conversation with him at my office in Rosebud. He came in and inquired about a bale of cotton that had been sold by Goolsby. I told him that I had bought the cotton and he stated that I would have to pay for it again; that Goolsby had sold the cotton without his permission, and beat him out of the money, or something of that kind, and that he didn't propose to stand it. He went on to say no man could beat him and live. I believe the words were "no son of a bitch could beat him out of money and live." It was a week or ten days after this that I heard of the killing. Defendant was drinking at the time. Cross: "I don't know whether defendant and Goolsby had a settlement about the cotton or not. I never had any more trouble about it."

W. M. Harding, for defendant, testified: "I know defendant and knew Robert Goolsby in his lifetime. Was with defendant at the time Goolsby was killed. We had been to Rosebud. * * * All three had gone to town that morning with a load of cotton—defendant, Goolsby and myself; went in Holloway's wagon. The purpose of going to town was to sell the cotton. When they got to Rosebud, Holloway sold the cotton and paid Goolsby for his part of it. Holloway and Goolsby were not drinking when they settled up. Goolsby then went off and Holloway staid there in the store awhile. Don't know what time we started home, but it was after dinner. Had gotten four miles from Rosebud when this trouble came up. Before it came up Goolsby had been wanting to fight

45 Crim.—20.

and put defendant out of the wagon; he wanted defendant to get out of the wagon and fight him. The first I heard of the trouble was that Mr. Goolsby wanted to fight, and defendant told him he didn't want to fight anybody. Then I heard Holloway say, 'Don't come at me with that knife,' and about that time the shooting began. I was in the front end of the wagon, driving. Defendant was in front, also, but a little to my rear, and Mr. Goolsby was behind. When the shooting commenced the horses commenced to run. When I looked around Goolsby was down, and there was a knife lying by his side in the wagon. Goolsby was in the wagon at the time the shooting commenced, and when I looked round he had pitched forward and was lying on the floor. The shots were fired right close together; just as quick as he could shoot. I don't know how many shots were fired. I had only taken one drink that day. Have been drunk once in my life, but it was not on this occasion."

Cross-examination: "I did not say that the first thing I heard was Holloway telling Goolsby not to come at him with that knife, for before that he was wanting to put Holloway out of the wagon. It went on until we got down the road apiece and Holloway told him to get out of the wagon if he couldn't behave himself. When Holloway told him to get out of the wagon, the next thing I heard was Goolsby saying he would cut his damned throat, or kill the son of a bitch; and Holloway said for him not to come at him with that knife, and the shooting commenced. Don't know what Goolsby was in fact doing at the time; don't know whether the knife was raised or not. When I turned round the shooting had commenced; Goolsby had pitched forward."

The defendant testified at length in his own behalf, but we believe the above is a sufficient statement of the facts leading up to and attendant upon the killing.

No briefs for either party have come to the hands of the Reporter.

*Howard Martin,* Assistant Attorney-General, for the State.

HENDERSON, JUDGE.—Appellant was convicted of manslaughter, and his punishment assessed at confinement in the penitentiary for a term of three years; hence this appeal.

Appellant objected to the testimony of Charley Myers, to the effect that appellant, on the evening of the homicide, and shortly before the same occurred, stated to him, in the store, that no man could beat him (defendant) out of $50 and live. That he would kill him before he got home. This testimony was objected to, on the ground that defendant mentioned no names in connection with said statement, and that, consequently, said statement did not relate to deceased, and was irelevant and immaterial. The bill does not state that these were all the facts attending the introduction of said evidence, so as to show that the court erred in admitting the same. There is other testimony

tending to show that appellant alluded to deceased when he made this remark. One witness—Frank Dunklin—testifies directly that he made the same remark to him concerning a settlement with Goolsby, deceased. Looking at the record, there is no question but that the remark referred distinctly to deceased.

After the State had rested the case on purely circumstantial evidence, appellant requested the court to require the State to put W. M. Harding on the stand, who was an eyewitness to the transaction, insisting that where there was an eyewitness, the State was required to place such eyewitness on the stand. In this connection we are referred to Thompson v. State, 30 Texas Crim. App., 325. The doctrine announced in that case was discussed in McCandless v. State, 42 Texas Crim. Rep., 655, and the views therein announced were seriously questioned. However, the court explains the bill of exceptions, showing that appellant confessed the act of killing, which has been held by this court to be positive evidence. Furthermore, the court stated that the eyewitness was a brother-in-law of appellant, and was unfriendly to the State, and, besides, had previously testified he was so drunk at the time that he knew nothing about the facts of the case. We do not believe the court erred in this matter.

Appellant put his character in issue as being a good, quiet, peaceable and law abiding citizen. During the cross examination of appellant's witnesses, the State was permitted to prove by them that they had heard defendant had been sent to the penitentiary for theft of cattle; that it had been discussed in the neighborhood where witnesses and defendant lived, when his reputation was being discussed. This was objected to on the ground that it was immaterial and irrelevant to any issue in the case, and did not tend to prove or disprove whether defendant's reputation as a quiet and peaceable citizen was good. Of course, it was not competent for the State originally to put appellant's reputation in issue; but, he having done so, it was proper, on cross-examination of his witnesses, to prove by them particular acts of misconduct; or, where the proof was of general reputation on the part of appellant, that the witnesses had heard of particular acts of misconduct. Rice's Crim. Ev., p. 603, citing State v. Merriman, 34 S. C., 16.

We do not believe the court erred in charging on temporary insanity, caused by the recent use of ardent spirits, as there was evidence tending to show that appellant was under the influence of liquor at the time of the homicide.

The following portion of the court's charge is also complained of as erroneous: "The evidence before you relative to defendant having served a term in the penitentiary can only be considered by you as affecting defendant's reputation as a good citizen, and you will consider the same for no other purpose whatsoever." This is objected to on the ground that such testimony could only be considered with reference to the credibility of appellant. The testimony does not appear, from the

record, to have been introduced for this purpose, but merely in cross-examination of appellant's witnesses as to his character, which he placed in issue. However, it was not competent for the court to submit appellant's character as a good citizen to the jury, as was done in the above charge. It was a charge on the weight of the evidence, and was calling the attention of the jury directly to appellant's character as a good citizen, without even undertaking to tell the jury for what purpose they could consider his character as a good or bad citizen. This testimony, pro and con, was before the jury, and like other testimony, they could consider it for what it was worth, as shedding light on the transaction, and as indicating whether or not a person of the character of appellant was shown to have borne, would likely commit the offense charged against him. But it was not proper for the court to call attention to this matter, and thus to emphasize and make prominent the fact that there was evidence showing appellant had been in the penitentiary. For this reason, the judgment is reversed and the cause remanded.

*Reversed and remanded.*